IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DILBAR GUL DILBAR a/k/a DILBAR GUL TAJ ALI KHAN,<br><br>Defendant. | 25-MR-6065 |

### MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A STAY OF THE COURT'S DETENTION ORDER

THE UNITED STATES OF AMERICA, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, and Meghan K. McGuire, Assistant United States Attorney, hereby opposes the defendant's motion for a stay of his detention pending appeal. (Dkt. 9.)

### INTRODUCTION

When the Magistrate Judge ordered the defendant's release, she specifically noted that it was not an "easy or clearcut decision." In ultimately deciding to release the defendant, the Magistrate Judge found the third Section G Factor—the history and characteristics of the defendant—to be "the most significant in her analysis." The Magistrate Judge based her decision to release the defendant in "particular" on what she believed was his lack of any criminal history and the modest financial resources available to him. These were conclusions that the Magistrate Judge drew from the facts that were proffered to her. Unfortunately, the facts were incomplete, and the resulting conclusions were erroneous.

1

As such, in its motion to revoke the Magistrate Judge's Release Order, the government focused on proffering additional information that showed the defendant does have a criminal history, connections to a designated Foreign Terrorist Organization, and access to financial resources in the United States.

All this information was either discovered or declassified after the detention hearing. The government is still in the process of discovering and declassifying more information about the defendant's history and characteristics and his conduct here in the United States. For example, since Thursday's hearing, the government has discovered evidence that the defendant himself sent $600 to Afghanistan on April 12, 2025, less than a month before he was arrested. The government has also discovered that the defendant had Mohammad Musa Khawrin's cell phone, WhatsApp, and Telegram numbers all saved in his iPhone contacts as of the date of his arrest. The government hopes to discover and declassify even more information about the defendant before any appeal is argued.

This was a close case before the government discovered and declassified additional information about the defendant's criminal history and connection to the Haqqani Network. Now, the cumulative information that the government proffered tips the Section G analysis firmly in favor of detention.

**FACTUAL BACKGROUND**

In 2009, the defendant worked as a translator in Afghanistan, but he was ultimately fired from his position. In 2011, the Department of Defense obtained evidence from a crime scene in Afghanistan. One piece of evidence was a handwritten note with a series of letters

and numbers written on it. These appear to be military grid coordinates. The note was found next to another piece of evidence. The nature of that piece of evidence is still classified.

Both the note and the second piece of evidence were submitted to the Terrorist Explosive Device Analytical Center. The defendant's fingerprint was found on the note

That same year, in 2011, the defendant was arrested for impersonating an Afghan National Police criminal investigator.

Two years later, in 2013, the defendant attempted to obtain another position as a translator with the allied forces. That application was denied specifically because the defendant's 2011 arrest for impersonating an Afghan National Police officer made the defendant a security risk.

After his attempt to become reemployed by the United States military failed, the defendant spent the next few years trying to obtain admission to the United States. In 2016, the defendant submitted the first of his two fraudulent visa applications.

The first step in obtaining that visa is to obtain approval from the Chief of Mission in the US Embassy Kabul, commonly referred to as "COM Approval." The defendant's COM approval was denied because he failed to provide sufficient documentation to verify his employment. However, the defendant used this COM denial letter to create a fraudulent COM approval letter, and he proceeded to file a visa application with that fraudulent "approval" letter. The COM "approval" letter was immediately identified as a forgery, and this first visa application was denied in January 2018.

The defendant spent the next three years reaching out to various companies with operations in Afghanistan and trying to get letters of employment from them. He never worked for any of these companies. But the defendant would write the companies and claim that he had worked for them. In asking for an employment letter, the defendant used different names and dates of birth, hoping one of those companies had bad enough record keeping that they would not realize he never worked for them. Each of these companies ultimately denied his request, because he never worked for any of them

At the same time, in 2018, the defendant had a series of contacts over Facebook with an individual named Mohammad Musa Khawrin. Khawrin was a member of Hezb-E-Islami Gulbuddin (HIG), which is a "political and paramilitary organization in Afghanistan founded in 1976 by former Afghan prime minister Gulbuddin Hekmatyar, who has been prominent in various Afghan conflicts since the late 1970s. Hezb-e Islami Gulbuddin (HIG) is an offshoot of that original Hezb-e-Islami, and is a virulently anti-Western insurgent group whose goal is to replace the Western-backed Afghan Government with an Islamic state rooted in sharia in line with Hekmatyar's vision of a Pashtun-dominated Afghanistan." (Dkt. 6-2.)

Khawrin and his brother were also connected to senior Taliban officials. And, most importantly, Khawrin had ties to the Haqqani Network, a designated Foreign Terrorist Organization. Khawrin was specifically known to the United States military for stoking anti-American activity in Afghanistan.

Between July and September of 2018, the defendant exchanged seven Facebook messages with Khawrin. These exchanges took place while the defendant was working to obtain an Afghan SIV and admission to the United States. The defendant was still Facebook

friends with Khawrin as of the date of his arrest. Further, upon review of the defendant's phone, which was seized on May 1, 2025, the defendant had Khawrin's cell phone, WhatsApp, and Telegram numbers all saved in his iPhone contacts.

In 2021, the defendant submitted his second fraudulent visa application. This time, the defendant purchased fraudulent employment letters. The first fraudulent employment letter was from a company that is now known to law enforcement for selling fraudulent employment letters to visa applications for a fee. In fact, according to the Department of State's records, over 100 letters of employment that have been submitted by this company have been identified as fraudulent. Not a single one is legitimate.

The second fraudulent employment letter was from an individual named "Ray James." "Ray James" was posing as a supervisor for a United States military contractor. In exchange for a fee, "Ray James" would issue visa applicants fraudulent employment letters and then verify that employment with the Department of State ("DOS"). The defendant's email show him communicating with Ray James about this letter of recommendation and the DOS's ensuing efforts to verify its authenticity.

The third fraudulent letter of recommendation was from an individual named "Arlene Serrett," who claimed to live in Rochester, NY, in the same house where the defendant now resides.

Armed with these three fraudulent employment letters, in 2021, the defendant made his second attempt at obtaining a COM approval letter, and this allowed him to proceed and file his second visa application. The visa application itself, the Form 260, requires the applicant to answer a number of questions under penalty of perjury. These questions include:

whether the applicant has previously been denied a visa; whether the applicant has ever been arrested; and whether the applicant has ever engaged in terrorist activities. The defendant answered "no" to each of these questions.

If he had told the truth and at least admitted that his 2016 visa application had been denied, the government would have identified the defendant as inadmissible. Instead, because of these additional lies, the defendant's visa application was granted.

In April 2024, the defendant entered the United States. One of the first things the defendant did when he got here was apply for a New York State license to act as a security guard.[1] Given the defendant's history—including his past arrest for impersonating an Afghan Police Officer, the presence of his fingerprint at a crime scene in Afghanistan, and his connections to the Haqqani Network—the defendant's immediate attempt to obtain a security guard license set off alarm bells within the law enforcement community.

The FBI's Joint Terrorism Task Force immediately opened an investigation. That investigation has revealed a couple of things:

First, it resulted in the proof outlined in the Criminal Complaint, overwhelming proof that the defendant committed multiple instances of fraud in order to obtain his visa and admission to the United States.

Second, since arriving, the defendant has continued to be in contact with "Ray James," the individual who falsified his second letter of employment. They have exchanged

---

[1] The defendant has since abandoned that application as a condition of his release. However, he is now in the process of obtaining a commercial driver's license ("CDL"), another step that raises alarm bells among law enforcement.

identification documents, including a United States-issued badge that belonged to the defendant's brother, who is still in Afghanistan. It also appears that the defendant made an additional payment to "Ray James" after the defendant arrived in the United States.

Third, the defendant's phone records show that, since arriving in the United States, he has been in contact with a second individual who is currently being investigated for large-scale fraud related to the Afghan SIV program.

Fourth, when law enforcement searched the defendant's residence, they found visa and identity documents belonging to other Afghan nationals, who do not live in that residence. One of the individuals whose identification documents were in the defendant's residence was "Subject A."

Subject A is also an Afghan national who lives in Rochester, NY. Law enforcement found travel documents—including boarding passes and baggage checks—that indicated Subject A traveled back to Afghanistan between January and March of 2025. Law enforcement also found a Money Gram receipt showing Subject A sent money to a person in Afghanistan in 2025. All of these documents were in the defendant's residence.

Fifth, law enforcement found a picture on the defendant's iPhone of stacks of $50 bills. This picture was taken at Subject A's residence in January of this year.

Sixth, law enforcement has discovered evidence on the defendant's iPhone that indicates on April 12, 2025, the defendant sent $600 to the same individual in Afghanistan to whom Subject A previously sent money.

Seventh, law enforcement also discovered evidence on the defendant's iPhone that he had Khawrin's cell phone, WhatsApp, and Telegram numbers all saved in his contacts.

## **PROCEDURAL HISTORY**

On April 29, 2025, the defendant was arrested and charged by criminal complaint with committing visa fraud in violation of Title 18, United States Code, Section 1546(a). At the initial appearance, the government moved to detain the defendant under Title 18, United States Code, Section 3142(f)(2)(A), on the grounds that there is a serious risk of flight. The defendant requested that a detention hearing be scheduled for May 9, 2025.

Prior to the detention hearing, the United States Probation Office prepared a Pretrial Services report, which concluded that there was no condition or combination of conditions that would assure the defendant's appearance. Probation therefore recommended detention.

The Magistrate Judge held a detention hearing on May 9, 2025, and both the government and the defendant proceeded by proffer. The Magistrate Judge took the parties' arguments under advisement until May 13, 2025, when she issued an oral decision releasing the defendant under certain conditions, which included a third-party custodian, a $6,000 cash bond, surrender of the defendant's and his minor children's passports, and home detention with electronic monitoring. The defendant was released on May 15, 2025.

On the morning of May 14, 2025, the government filed its Notice of Motion and Motion for: (1) an Order revoking the Magistrate Judge's Release Order, pursuant to Title 18, United States Code, Section 3145(a)(1); and (2) an Order staying the Magistrate Judge's

Release Order until such time as this Court can hear and determine the government's motion for review.

This Court denied the government's motion for a stay but ultimately, after a hearing on May 29, 2025, granted the government's motion to revoke the release order and detained the defendant.

## APPLICABLE LAW

The standard for a stay pending appeal to an appellate court, as articulated in *Nken v. Holder*, 556 U.S. 418 (2009), applies to the current motion. In *Nken v. Holder*, the Supreme Court said the following:

> A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case. The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.
>
> The fact that the issuance of a stay is left to the court's discretion does not mean that no legal standard governs that discretion. A motion to a court's discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles. As noted earlier, those legal principles have been distilled into consideration of four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. at 433-34 (quotations and citations omitted).

## DISCUSSION

*1) The Government is likely to succeed on the merits of the defendant's appeal*

The government has a strong chance of prevailing on the merits of the defendant's appeal. The Second Circuit will review this Court's detention order only for "clear error." *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019) ("Generally, we apply deferential review to a district court's order of detention and will not reverse except for clear error, *i.e.*, unless on the entire evidence we are left with the definite and firm conviction that a mistake has been committed.") (quotation omitted).

The defendant argues that "the Court committed legal errors both with respect to its receipt and crediting of unreliable information and its failure to apply the correct legal standard." (Dkt. 9, p. 1.) With respect to the defendant's first argument, the Second Circuit will give the Court's assessment of the parties proffers substantial deference. *See United States v. Martir*, 782 F.2d 1141, 1147 (2d Cir. 1986) ("In the informal evidentiary framework of a detention hearing, the methods used to scrutinize government proffers for reliability must lie within the discretion of the presiding judicial officer, informed by an awareness of the high stakes involved.")

The government's proffer was not, as the defendant repeatedly asserts, wholly "innuendo." The government proffered straight-forward assertions of fact followed by reasonable conclusions that can be drawn from those facts. The government has been careful not to misrepresent or exaggerate any of the proffered facts. In fact, the government provided discovery regarding its proffer to the defendant prior to the hearing—even though discovery is not required at this stage of the case—precisely so that the defendant had a fair opportunity

10

to examine the strength of the proof and argue (if possible) that there are other reasonable conclusions that can be drawn from it.

The defendant seems to suggest that, based upon the government's proffer, the Court found beyond a reasonable doubt that the defendant engaged in acts of terrorism. But that is not what the government proffered, it is not what the government was required to prove, and it is not what the Court concluded. The government proffered facts regarding the defendant's history and characteristics and the Court took that proffered information into consideration while weighing the Section G Factors.

In the end, the Court found that the government's proffered evidence, including what was proffered to the Magistrate Judge and supplemented by what was proffered to the Court, established that no condition or combination of conditions could reasonably assure the defendant's presence and the safety of the community. It was the correct decision and, given the deferential standard of review that the Second Circuit will apply, it is likely to be upheld.

With respect to the defendant's second argument, it is directly rebutted by the transcript of proceedings. This Court clearly knows, articulated, and applied the correct standard when issuing its decision. If the defendant's appeal hangs on the Court's use of the phrase "set of conditions" instead of "combination of conditions," then his likelihood of success is extremely low.

  2) *The Government will be irreparably injured absent a stay*

The government will be irreparably injured if this stay application is granted and the defendant is released because there is a serious risk that the defendant will flee or endanger

the community. The risk is even greater now that the defendant is aware of the nature of the government's proof against him.

The defense's proposed conditions do nothing to limit that risk. If the defendant decides that he wants to flee, either with or without his family, none of the proposed conditions will stop him.

For example, the proposed third-party custodian is someone the defendant has only known for a year. He does not live with the defendant and admitted during the detention hearing that he only sees the defendant approximately four days per week. He has no knowledge regarding the defendant's background. He also has no real ability to monitor the defendant's actions 24/7 or to stop the defendant from fleeing.

The home detention condition still allows the defendant to go to work at Amazon, where he will have access to a key element of this community's commercial infrastructure. The defendant is also in the process of getting his Commercial Driving License ("CDL") through Amazon. If he obtains that license, he could be driving tractor trailers around Monroe County while on pretrial release. Even on home detention, the defendant would be driving large vehicles around Monroe County and accessing public and private buildings. He would continue to pose a danger to the community and could flee at any moment.

An electronic monitoring bracelet also does nothing to prevent the defendant from fleeing. A defendant who wants to flee will cut their bracelet and flee. That is precisely why probation does not recommend electronic monitoring for people who are a risk of flight. It is more appropriate for cases like child sex abuse crimes, where a condition of release requires the defendant to avoid school grounds. The electronic monitoring bracelet works then

because it alerts probation that the defendant entered a school ground with the bracelet on. It is not an appropriate condition in a case like this where the risk the Court is trying to mitigate is the risk that the defendant will outright flee.

The $6,000 bond does not leave the defendant without any access to funds. The Magistrate Judge believed that this $6,000 represented the defendant's entire life savings and would leave him without access to significant financial resources. However, we now know that the defendant has access to substantial cash, at least through Subject A. He can and has also sent and received money through MoneyGram and Western Union. And he has multiple lines of credit.

This demonstrates why the financial monitoring condition is ineffective. That condition relies on the defendant to disclose his assets, liabilities, and lines of credit to the probation office. Probation's only mechanism for ensuring compliance with the disclosure requirement is a credit check. But a credit check will not capture cash, MoneyGram, or Western Union transactions. It also will not capture credit card transactions as long as the bill is paid on time at the end of each month.

The requirement that the defendant and his children surrender their passports is ineffective, first, because the defendant has already established that he can obtain falsified versions of these travel documents and, second, because he does not need a passport to flee within the United States.

The defendant's signed irrevocable waiver of extradition is unenforceable, and the government has already cited law to that effect.

Finally, with respect to the computer monitoring condition, probation has no way of implementing that condition in this case. The computer monitoring software uses key words to alert probation when a defendant is violating conditions of release. This works well, for example in child pornography cases. But it has no practical application here. First and foremost, the defendant's electronic communications are mostly in Pashtu, which probation has no means of translating. Second, even if the defendant were communicating in English, there are no key words that would reliably alert probation that the defendant is about to violate his conditions of release, flee, or commit another crime. Without key words, the devices will effectively be unmonitored except when a probation officer occasionally spot checks them.

The fact that the defendant allegedly complied with his release conditions while the government's motion was pending, from May 15th through May 29th, does not bolster his cause. He knew that the government's motion to revoke was pending. He also likely believed that, as long as he complied with his conditions during the pendency of the government's motion, he would likely secure permanent release for the duration of the case. Thus, he was strongly motivated to comply with his conditions for that limited period.

What the defendant did not know until two days before the hearing was the nature and scope of the government's proof regarding his past and possibly ongoing criminal activity and connections. Now, the defendant knows. He, and he alone, also knows what else the government is going to find as it continues its investigation over the next few weeks. Thus, there is an even greater risk that the defendant will flee now, while his appeal is pending, than there was before.

### 3) *The issuance of the stay will not substantially injure the defendant*

The defense has already ordered and obtained expedited transcripts of the Court's decision and presumably is preparing to file an expedited appeal. Federal Rule of Appellate Procedure 9(a)(2) requires the appeal to be determined "promptly." Thus, the defendant's appeal will be heard and decided quickly.

The defendant claims that he may lose his employment at Amazon if he is detained pending appeal.[2] However, it is worth noting that the defendant was originally arrested on May 1st and detained pending his detention hearing on May 9th. It was the defendant who requested that the detention hearing be held on May 9th, eight days after his initial arrest. The Magistrate Judge did not issue her release order until May 13th, and the defendant was released on May 14th. Thus, as a result of the defendant's own scheduling requests, he was already detained for 14 days and apparently did not lose his job at Amazon during that time.[3]

Given the government's and the public's strong interest in preventing the defendant from either fleeing or endangering the community while his appeal is pending, a brief additional period of incarceration is not unreasonable and will not substantially injure the defendant.

---

[2] While we are examining the reliability of each party's proffers, the defendant has repeatedly represented that he works daily, 10-hour, overnight shifts at Amazon but has never provided any support for that assertion or, for that matter, any other assertion made by the defendant in support of his release argument.

[3] Again, the defendant has not substantiated his claim that he could in fact return to Amazon if he were released pending this appeal.

15

    *4) The public interest lies in favor of detaining the defendant pending resolution of the government's motion*

The visa program has extensive vetting procedures for a reason. When people lie and evade those vetting procedures, they are inherently placing our country at risk. The defendant never should have been admitted to this country in the first place because he is a security risk. Now that we know that he is here, and that he fraudulently obtained admission to the United States, he needs to be in custody while this case is litigated.

The defendant cannot be released pending his appeal because, if he is released from custody and decides to either flee or commit another crime, there is no condition or combination of conditions that will stop him.

## CONCLUSION

Based on the foregoing, the government respectfully requests that the Court deny the defendant's motion for a stay of the Court's revocation of the defendant's release pending the defendant's appeal of the revocation order.

DATED: June 2, 2025

        MICHAEL DiGIACOMO
        United States Attorney
        Western District of New York

        By: *Meghan K. McGuire*
        Meghan K. McGuire
        Assistant U.S. Attorney
        United States Attorney's Office
        Western District of New York
        100 State Street, Suite 500
        Rochester, New York 14614
        (585) 399-3922
        Meghan.McGuire@usdoj.gov